Case No. 23-128, Richardson v. Edgewell Personal Care May it please the Court, Glenn Danis from Clarkson for Appellant Richardson. So the parties here seem to be talking past each other to some extent in the briefing. The issue here is not whether a disclaimer can ever defeat a claim of consumer deception. The issue is whether a disclaimer can do so when in conjunction with fine print that hides additional details. The issue was, I think, put pointedly by Judge Chhabria in the Strivectin case, which we cited, which was factually very similar to here, although obviously not binding, in which he said, if we accepted the other side's argument, this would be the equivalent of a front label warning that said, or a front label statement that said, this is safe for human consumption, on the back had a disclaimer with an asterisk that said, does not contain cyanide, but then in the ingredient list, in the prolix, in the fine print, it said, but does contain a lethal dose of ricin. That would be the equivalent of saying, well, this is not misleading because surely the does not contain cyanide narrows the meaning of the front label statement. In that situation, the back label would have a meaning that's entirely different from the front label. Here, I mean, I don't know about refriendly, but certainly Hawaii compliant, I don't really know what that means. And so isn't it reasonable then if you're going to have an asterisk to ask a consumer to look at the back and see here's what we mean by that phrase on the front? Yes. We're not, our argument is not that it's, that a reasonable consumer need not ever look at the back. I would say two things. Number one, excuse me, under New York law, under Guggenheim versus Ginsburg, it's 43 New York 2nd 268, the New York appellate court said, a reasonable consumer includes those who, in making purchases, does not stop to analyze, but are governed by appearances and general impressions. This is the binding state law on the issue. With respect to this court and in Mantecas, the court was, this court was saying, yes, you know, it is what we are not going to expect as a consumer to have to look at the rear label to parse fine print that is contra the front label. Here, the nature of our claims is that it contains, this product contains four different ingredients that are all reef damaging, and that that is directly contradicting the front label statement that it's reef friendly. Isn't the argument, I recognize what you said at the beginning, that the parties are sometimes at cross purposes, but it seemed to me after reading everything that the issue is, does the asterisk change things? Is the asterisk, in effect, what distinguishes this case from Mantecas? Because I suppose it said reef friendly asterisk, and then when you find the footnote that goes with the asterisk, it says, albeit in fine print, what we mean by that is that it does not contain these two reef damaging ingredients. Or what we mean by that is that it complies with Hawaii law. Isn't that different than just if you go and read the ingredients list, you see something different? The asterisk tells you what they mean by reef friendly. Well, I think I would say two things to that. I mean, number one, you know, we should look at this in terms of, you know, if the front label had said simply, just like many products might say contains no GMOs, if it had said does not contain oxynoxate and oxybenzone, and then had a ingredient list that it listed many things, including reef damaging, that would be a different case, and we would not be contending that that was misleading. What's misleading, and the reason why they don't do that, is because there's a superficial plausibility to having a front label broad statement of reef friendly, then trying to narrow it with one disclaimer that then is followed by fine print and prolex that takes away that front label and the narrowing. Yeah, I mean, would you say that maybe this is distinguishable from Manticus in a way that's helpful to you? Because there, if you looked at the back and saw the ingredient list, bleached flour leaps out at you. Here, what leaps out at you is the names of particular chemicals that, for all I know, are the kind of thing that you use when you're not using those bad reef damaging things that we're... Absolutely. Your Honor, so this is exactly our point. I actually believe we cited in our briefing a First Circuit case where the court said that a partial disclosure is more misleading than no disclosure at all. What a normal consumer, a reasonable consumer, would do would be to look at the disclaimer and say, okay, it doesn't have these two things that I would assume are the... what if they were included would be the problem. I'm now done with my due diligence. That's a hyper-vigilant consumer who's interested enough in the environmental claims... Even if you read the ingredient list, without going directly to Google or consulting some environmental website or something, I'd have no idea what these other things are. Nor would anyone, I think, who's not a scientist. I mean, what we're talking about here is allowing a hyper-technical and completely non-natural defense if we validate this argument that the consumer not only should have to read the disclaimer, but should then have to read and understand the fine print. Isn't this... I mean, the other question, I maybe should be asking this of your adversary, but I mean, this is basically a motion to dismiss, right? That's absolutely right, Your Honor. So isn't all you need to persuade us of to prevail is that you've made a plausible point, that accepting the facts in the complaint, a reasonable jury could conclude that the reasonable consumer would be misled by this? That's absolutely right, Your Honor. And, in fact, one of the reasons why the district court's ruling was incorrect and should be reversed is because even if there were equally plausible readings of what the labeling means, that would mean that the motion to dismiss should be denied. We're not here to decide whether this kind of labeling should be forbidden. Absolutely not, and it may very well be, Your Honor, that on the merits of the claims, my friends on the other side are absolutely correct, and a consumer, a reasonable consumer, would not have expected re-friendly to mean what we believe that they mean,  When cases like this are tried, do they typically involve consumer surveys and things like that, like misleading trademark things, that kind of case? Is that what it looks like? Absolutely. It's based on survey evidence, and there would be ample opportunity for the other side to vet and challenge the methodology to try and exclude it, to present their own evidence. I mean, this is simply whether the allegations are plausible, and this is nowhere close to the sort of tiny minority of cases that should lead to a dismissal on the pleadings. I realize that I'm over my time. If there aren't any other questions, I'll reserve my other three minutes for rebuttal. We'll hear you on rebuttal. Thank you. Mr. Davis. May it please the Court, Tom Davis for Edgewell. I'll start with that last comment, Judge. The plausibility does not mean that the least sophisticated consumer will be misled. Plausibility means does the vast majority, does the preponderance of the consumers, is it misleading to them? Sure, but how do I know whether that's true or not? In other words, we are cautioned that people like us are very sophisticated consumers, and so we should be skeptical of our own reactions to this. That suggests that we don't know from our own intuitions necessarily what reasonable consumers would do. While we may be very sophisticated in the law, et cetera, even normal consumers know what an asterisk means, and this is where I follow up on your other question, that even normal consumers will read the asterisk and know that there is something more to be said about this particular statement on the front. But how do they know from the asterisk that re-friendly includes products that are, in fact, not re-friendly? How is a reasonable consumer supposed to know that just with the asterisk and the explanation afterwards? Because the re-friendly asterisk, and that is the front side statement, re-friendly asterisk should be read as an entire statement. That statement is, in and of itself, ambiguous as the district court held. And so then when you follow to what is the back side statement, you see asterisk Hawaii compliant or no oxybenzone, no octanoxy, and those become definitional. This is, and a normal consumer knows from reading an asterisk that you look to the second half of the statement. This isn't a legal document. I mean, it's a picture with, like, a leaf and some numbers and lots of different fonts, and I wouldn't necessarily agree with you that it's reasonable to see an asterisk and think, oh, there's fine print. I need to look for what that means. You're certainly correct that it's not illegal to document. It's also, if you see the re-friendly at all on the front side of the product, you also see the asterisk because there are much more prominent things on the front of the product than the re-friendly. For example, re-friendly asterisk, like the SPF value, et cetera. So if you notice re-friendly asterisk, you're called to the attention to look to the back. Even if I were to agree, and I might, that even the ordinary person knows that an asterisk is a red flag. It's telling you this does not mean what you think it means. Then you go back to see what it means, and what you find is not something that says disclaimer. All we mean by this is that we do not have these two chemicals.  Then I look down at the ingredient list, and at that point, I have no clue about what those chemicals are like. I mean, what do you do with Mr. Dennis' hypothetical? I admit it occurred to me precisely that hypothetical before I read any of the other cases of the cyanide and strychnine example. It says, you know, maybe safe for humans is less ambiguous. It may be friendly, and on the back it says contains no arsenic with the asterisk. But then there's something not strychnine, something weird that nobody is not part of common. It's a chemical term, and one would not automatically recognize that as something poisonous. Let me answer. I think there are two parts to that. The first part is that there is no representation about the other chemicals. They're insinuating a representation about the other chemicals that is not there. The asterisk simply says these two ingredients are not in it. And so then the next question is, are those two things different? Is safe, which is a stryvectin example, is a very flat-out specific guarantee of safety. Friendly is not. So does this case then turn on would the reasonable average consumer interpret reef friendly, with or without an asterisk, to mean not harmful to reefs or to mean less harmful to reefs than the competition? The case turns on whether the phrase reef friendly asterisk on the front is ambiguous, as the district court held. If it's ambiguous and then can be explained by another statement. Yeah, but maybe it can be explained by what the reasonable consumer thinks. Maybe if 100% of average random people thought reef friendly means the same thing as reef safe, then it wouldn't be ambiguous in practice at all. It would just, it could mean something else, but we have to find out what reasonable consumers think. Because that says a lot about how you read the disclaimer, doesn't it? It's not a disclaimer. It just says does not contain these things. If the reasonable consumer taking reef friendly with the footnote thinks, oh wow, this is good for reefs because it doesn't have this bad stuff in it, when in fact it has other bad stuff. And I don't even know. I mean, this is just an allegation. Maybe at the end of the day it turns out that a bellow or whatever is not harmful to reefs. That's just the allegation. But that is the allegation that we have to take as true for these purposes. So why wouldn't, isn't it a perfectly plausible thing to think that the average consumer would not read reef friendly, even with the disclaimer, to mean anything other than it doesn't have the stuff that hurts reefs? Not in this context, Your Honor, because it's distinguishable from like the Manticus case where you have something that is a very well, it's almost a term of art, you know, whole grain or something that is defended. Yeah, but you know, in Manticus there were two packages. One of them said whole grain. That sounds to me like the term of art thing works. Then somebody thought maybe we should do this a little differently, and they said made with whole grain. That is literally true. The Cheez-Its were made with, among other things, whole grain. It still wasn't good enough for the court, right? And that's for two reasons. One, the very definitive statement and understanding of what whole grain means in a nutritional context. And two, we have the distinction here where we have the asterisk drawing your attention to the other statement, whereas in Manticus you did not. Instead, the court said in Manticus you would be looking, the normal consumer would be looking at the nutrition label to confirm the statement on the front. And you're saying these are not empirical questions that need to be fleshed out with expert testimony and the common sense judgment of six, eight, or 12 reasonable consumers sitting in a jury box. But we can tell that this is good enough. Yes. In fact, the Second Circuit's law says under this situation that this can be decided as a matter of law. Can be. Can be. And you look at- In those cases where it's quite clear. And I submit, Your Honor, it is clear because of the reasons we've explained. It's because you can look from one to the other and it becomes definitional. I'd like to try to understand a little bit more clearly what your argument is to the work that the asterisk is doing. I mean, it's one thing to clarify what's meant by an ambiguous statement, and it's another thing to give a different meaning that's contrary to an understanding of a relatively unambiguous statement. So if we take as true that the actual ingredients included are reef damaging, then the asterisk, it seems like you're asking us to find, can actually change the meaning of reef friendly.  Well, in this case, remember the context is crucial in this instance. The asterisk draws you to what is uncontrovertedly two chemicals which are banned in Hawaii. So it becomes Hawaii compliant, no oxybenzone, no octanoxate. The plaintiff's own complaint indicates that those two chemicals are deleterious, is the word in the complaint, to reefs. And so it draws your intention to a true statement. They even call it half true in their brief. But I submit, Your Honor, that when you link them together, it becomes entirely true. Reef friendly asterisk leads you to the true statement. Okay. I think I follow that. What about the actual ingredients that are included in the product? It makes no statement about those. It just is simply saying that reef friendly asterisk means that these two acknowledgedly harmful ingredients are not in the product. These products, these ingredients have been removed. And that, in fact, is what happened after the Hawaii legislation occurred. Then they adapted the formula to remove those two harmful ingredients. And they acknowledged those ingredients are harmful. So that's all it's saying is that we have removed those ingredients which they acknowledge are deleterious to reefs. It's just a linking of those two statements. And it makes no comment about the other one. It's making no representation about the other ingredients. Thank you. Thank you. So just a couple points. Number one, what Judge Jahabria referred to as absurd, the notion meaning that the manufacturer can define a clear statement on the front as anything it wants, I think is something that is not lost on the panel. The idea here that reef safe can simply mean something as esoteric as doesn't contain these very two ingredients would be to validate exactly what this court held in Mantecas is to encourage highly deceptive advertising. I think the other, number two, the other point about different hypotheticals, that could be a front label that says vegan and on the back says, you know, an asterisk that says contains no beef and then in the proleg says but does contain chicken. That would be exactly what the other side is saying should be validated, except at least in that situation people would understand what chicken and beef are. Here we're talking about things that the reasonable consumer, it's simply beyond their category. Well, yeah, I mean it's more like better hypothetical than yours perhaps is instead of it actually says contains chicken, which anyone could tell is not meat, contains gelatin or something like that. Exactly. That would be not vegan, but maybe not everybody knows that that's an animal product. Exactly. I think that's exactly right, Your Honor. I would, number three, I would just point to the fact that in our complaint, to the extent the opposing counsel is hanging its hat on somehow the difference between safe and friendly, we cite in paragraph 18 of the first amended complaint exactly what friendly means in this context, supported by dictionary definitions, FTC green guides, and the fact that, for instance, eco-friendly has a distinct meaning of does not harm the environment. So this is a distinction without a difference to sort of hone in on the precise word on the front. Finally, just this point about the Hawaii compliant, even that is not entirely clear. Hawaii did add two of these four other ingredients to its bill that hasn't yet passed, but still is it. But it's still, it's compliant with Hawaiian law as of the time that that legend was put on there. That's right. As of the time that Ms. Richardson bought her stuff, which I think didn't have the Hawaii compliant. Absolutely, Your Honor. I'm simply making the point that even the most extreme set of arguments in their favor on one minor version of the disclaimer is itself still not entirely clear and would not dispel very clear front label deception. I don't know if it said complies with all Hawaiian regulations. I suppose that is trading on some perception in mainland United States that, oh, the Hawaiians wouldn't let anything bad for reefs through. But it's still, that would be, by this we mean compliant. I think that's true, although I would say that preparing for argument, I Googled Hawaii, and in fact it appears there are sort of counties at this point that have outlawed these particular. So if we want to be hyper technical about what it means to be Hawaii compliant, it might not even be that. Okay, that's a side show. But in any event, if there aren't any other questions, we'll rest. Thank you, counsel. Thank you very much. We'll take the case under advisory.